IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

MARIE SHUMAKER,         )
    Plaintiff,            )
                       )
          v.             )     Civil No. 3:13cv308 (JAG)
                       )
CAROLYN W. COLVIN,       )
Acting Commissioner of Social Security,  )
    Defendant.          )
                       )

## REPORT AND RECOMMENDATION

Marie Shumaker ("Plaintiff") is 67 years old and previously worked as a bank teller, customer service representative, floral shop manager/owner and commercial lending supervisor. On October 24, 2007, Plaintiff applied for Social Security Disability ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act") with an alleged onset date of May 23, 2007, claiming disability due to lumbar radiculopathy and right trochanteric bursitis. Plaintiff presented her claim to an administrative law judge ("ALJ"), who denied Plaintiff's request for benefits. The Appeals Council granted Plaintiff's request for review and remanded the case back to the ALJ. After a second hearing and further development of the record, the ALJ again denied Plaintiff's request for benefits and the Appeals Council denied Plaintiff's request for review.

Plaintiff now challenges the ALJ's decision, asserting that the ALJ erred in determining that Plaintiff could perform her past relevant work and incorrectly assessed Plaintiff's credibility. (Pl.'s Mem. in Supp. of Mot. for Summ. J. ("Pl.'s Mem.") (ECF No. 9) at 16-29.) Plaintiff seeks judicial review of the ALJ's decision in this Court pursuant to 42 U.S.C. § 405(g). The parties

have submitted cross-motions for summary judgment, which are now ripe for review. Having reviewed the parties' submissions and the entire record[1] in this case, the Court is now prepared to issue a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons set forth below, the Court RECOMMENDS that Plaintiff's Motion for Summary Judgment (ECF No. 9) be DENIED; that Defendant's Motion for Summary Judgment (ECF No. 11) be GRANTED; and that the final decision of the Commissioner be AFFIRMED.

## I.  BACKGROUND

Because Plaintiff challenges the ALJ's determination that Plaintiff could perform her past relevant work as a "Supervisor, Lending Activities" and the ALJ's assessment of Plaintiff's credibility, Plaintiff's education and work history, Plaintiff's medical history, state agency physicians' medical opinions, Plaintiff's Function Reports, Plaintiff's testimony and vocational expert's testimony are summarized below.

### A.  Education and Work History

Plaintiff is 67 years old and completed high school. (R. at 138, 175.) She previously worked as a supervisor in the manufactured house industry. (R. at 170.) She also worked as a customer service representative and commercial lending supervisor. (R. at 170.) Most recently, Plaintiff worked as a bank teller at Wachovia until she stopped working, following a fall in which she injured her spine, leg and buttocks. (R. at 169-70.) Plaintiff received long-term disability upon being unable to return to work. (R. at 25.)

---

[1]      The administrative record in this case has been filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C.) In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

On December 2, 2008, Plaintiff testified during a hearing that from 1997 through 1998, she worked for Jefferson National Bank, which merged with Wachovia, as a supervisor of collateral. (R. at 29.) The position involved filing and entering all of the collateral that came into the office into the computer and running reports for the office. (R. at 29.) Plaintiff worked under a manager and did not "really. . . get to supervise in that position." (R. at 29.) Plaintiff also testified that she worked as a loan processor at Countrywide for six months. (R. at 46.) She left this job, because she had difficulty learning the computer skills required. (R. at 47.)

During a hearing on February 7, 2011, Plaintiff clarified that while working as the supervisor of collateral, she supervised six employees and worked with the collateral required for processing a loan. (R. at 62.) Plaintiff testified that this position required "quite a bit" of walking. (R. at 63.) She walked between her employees' work spaces, filed, pulled loan files and photocopied reports, which required standing. (R. at 63.)

B.      Vocational Expert Testimony

On February 11, 2011, a vocational expert ("VE"), Dr. Andrew V. Beale, completed a Vocational Interrogatory. (R. at 245-46.) After reviewing the record, Dr. Beale indicated that Plaintiff's past work as a commercial lending supervisor of six employees in a bank's loan collateral department did not have a specific Dictionary of Occupational Titles ("DOT") title. (R. at 245.) However, Dr. Beale opined that the appropriate title for Plaintiff's work was "Supervisor, Lending Activities," which is defined by DOT 249-137-034. (R. at 245.) In making this determination, Dr. Beale reviewed Wachovia's position statement describing their loan review analyst and credit analyst positions. (R. at 245.) Then, Dr. Beale indicated that the person who supervises these positions would be classified as a "Supervisor, Lending Activities"

3

under the DOT code. (R. at 245.) Dr. Beale noted that the "Supervisor, Lending Activities" position was sedentary in nature. (R. at 246.)

      C.    Medical Records

On May 21, 2007, Plaintiff sought treatment from Joseph W. May, M.D. for pain in her back stemming from a fall on Mother's Day. (R. at 341.) Plaintiff exhibited tenderness and Dr. May opined that Plaintiff strained her sacroiliac joint. (R. at 341.) Dr. May administered an injection to relieve any pain and recommended that Plaintiff keep her body straight, use ice, stretch and avoid twisting. (R. at 341.) Plaintiff followed-up with Dr. May on May 29, 2007, complaining of right hip pain and indicated that she had difficulty working. (R. at 341.) Dr. May opined that Plaintiff could be off work for a significant time and ordered Plaintiff to avoid twisting, tugging, pushing and pulling. (R. at 341.) Dr. May recommended that Plaintiff treat her pain with heat and ice and remain passive, but suggested that Plaintiff should not "lay down and do nothing." (R. at 341.)

Plaintiff returned to Dr. May on June 7, 2007, and complained of worsening back pain that moved down to her right leg. (R. at 340.) He excused Plaintiff from work until June 21, 2007. (R. at 340.) On June 12, 2007, Jeffery D. Stanczak, M.D. performed an examination of Plaintiff's back due to her lower back pain. (R. at 291.) The examination revealed degenerative changes and retrolisthesis, but no spondylolysis. (R. at 291.) That same day, Plaintiff received x-rays and returned to Dr. May to review the results on June 13, 2007, which revealed degenerative changes in her spine. (R. at 340.) Dr. May could not offer an opinion as to the cause of the degenerative changes and, therefore, referred Plaintiff for a second opinion. (R. at 340.)

Plaintiff returned to Dr. May on June 20, 2007, after seeking a second opinion and undergoing physical therapy. (R. at 339.) Plaintiff continued to experience back pain radiating from her right leg to her knee. (R. at 339.) Plaintiff experienced arthritis in her spine and retrolisthesis, but doctors were unable to determine the cause of the conditions and, therefore, ordered an MRI. (R. at 339.) On June 26, 2007, Dr. Stanczak compared the results of a new MRI with Plaintiff's previous examination and reported that Plaintiff experienced minimal bulging and mild central stenosis at L4-L5. (R. at 289.)

On July 2, 2007, Christopher Lander, M.D. treated Plaintiff for pain management. (R. at 286.) Plaintiff reported to Dr. Lander that she felt pain in her right lower back since her fall in May. (R. at 286.) She described the pain as continuous, but indicated that walking, stooping and bending increased her pain. (R. at 286.) She could not sleep on her back or right side and walking caused weakness, but no numbness. (R. at 286.) Plaintiff rated her pain at a five on a scale of one to ten. (R. at 286.) Dr. Lander performed an MRI, which revealed mild disc bulging and mild stenosis. (R. at 283.) Dr. Lander administered steroid injections and Plaintiff maintained full motor and sensory function following the procedure. (R. at 284.)

On July 10, 2007, Dr. May indicated that Plaintiff continued to experience low back problems, but Plaintiff exhibited "some return of function." (R. at 339.) On July 26, 2007, Dr. Lander noted that Plaintiff had a positive response to the injections, had a "mild recurrence of pain" and that the injections reduced the severity of Plaintiff's pain. (R. at 280.) Plaintiff received additional injections, which Plaintiff tolerated well, and Dr. Lander noted that the procedure provided complete pain relief. (R. at 280.) On August 21, 2007, Plaintiff returned to Dr. Lander for a steroid injection, which Plaintiff tolerated well. (R. at 278.) Dr. Lander noted that Plaintiff had a "modest response" to her last injections. (R. at 278.) Plaintiff returned to Dr.

May on August 27, 2007, seeking approval to remain off work, because she continued to feel pain. (R. at 339.) Dr. May reported that Plaintiff's previous injections appeared to be "minimally helpful" in alleviating Plaintiff's pain. (R. at 339.)

During Plaintiff's September 12, 2007 appointment, Dr. May indicated that Plaintiff's response to treatment had been poor and that she experienced a fair amount of pain. (R. at 338.) Dr. May opined that Plaintiff may require surgery and ordered Plaintiff to refrain from work. (R. at 338.) On October 3, 2007, Plaintiff's pain was isolated to radiating down her leg. (R. at 338.) Dr. May noted tenderness, prescribed Depo-Medrol and Xylocaine, and recommended that Plaintiff use a passive exercise program. (R. at 338.)

On October 23, 2007, Robert E. Adams, M.D. saw Plaintiff and reported that Plaintiff had some modest degenerative changes. (R. at 305.) Dr. Adams noted that Plaintiff's EMG failed to demonstrate anything relating to Plaintiff's pain. (R. at 305.) Dr. Adams opined that pain medications would be Plaintiff's best treatment option, because structural neurology treatment would not help. (R. at 305.) Plaintiff underwent physical therapy on October 24, 2007, at HealthSouth to help relieve her pain, increase her mobility and repair soft tissue restrictions in her lower back and right buttocks. (R. at 301.) During physical therapy, Plaintiff rated her pain as a six on a scale of one-to-ten. (R. at 300.) Plaintiff's treatment plan required therapy, including aquatic exercises, twice a week for four weeks. (R. at 301.)

Plaintiff followed up with Dr. May on November 6, 2007, to discuss nerve conduction studies. (R. at 338.) Plaintiff continued to experience pain that radiated down her leg. (R. at 388.) Dr. May recommended that Plaintiff continue to take Ultram and undergo physical therapy. (R. at 338.)

On November 21, 2007, Plaintiff's physical therapy notes indicated that Plaintiff's mobility improved and she had very slight restrictions. (R. at 425.)   Plaintiff reported no pain during her November 27, 2007 physical therapy appointment. (R. at 424.)  Her pain decreased from a nine to a five on a one-to-ten scale and to a three during Plaintiff's December 7, 2007, and December 11, 2007 physical therapy sessions, respectively. (R. at 420-21.)   During Plaintiff's January 10, 2008 appointment with Dr. May, Plaintiff complained of back pain and spasms in the morning, which created difficulty in Plaintiff getting out of bed and walking. (R. at 337.)  Dr. May noted that Plaintiff's MRI demonstrated significant disc disease. (R. at 337.) Injections had not been helpful in alleviating Plaintiff's pain and Dr. May prescribed a TENS unit. (R. at 337.)

On January 22, 2008, Dr. Adams completed a disability determination and opined that Plaintiff exhibited normal findings in all reflexes, coordination, gait and station, upper extremities and lower extremities, except that she experienced moderate movement against gravity and resistance in her ileo-psoas. (R. at 304.)  During Plaintiff's January 23, 2008 physical therapy appointment, Plaintiff rode a stationary bike for eight minutes and demonstrated decreased tenderness. (R. at 409.)  Plaintiff attended a follow-up appointment with Dr. May on January 24, 2008, during which Dr. May noted that Plaintiff's condition improved with physical therapy by increasing Plaintiff's strength and pelvic flexion. (R. at 337.)   Plaintiff had no discomfort with strength lifting during her physical therapy appointment on February 4, 2008. (R. at 405.)  While Plaintiff continued to experience weakness in her right hip, her pain decreased from a four to a three on a scale of one-to-ten. (R. at 404.)  Plaintiff rated her pain as a two on a scale of one-to-ten after her February 20, 2008 treatment. (R. at 401.)

On February 7, 2008, Plaintiff visited Peter J. Bower, M.D. for an initial comprehensive evaluation. (R. at 331.) Plaintiff complained of right lower back and lower extremity pain. (R. at 331.) Dr. Bower noted that no surgical options existed, but that physical therapy helped to a "fair degree." (R. at 331.) During the physical examination, Dr. Bower indicated that Plaintiff suffered tenderness, muscle imbalance, weakness, strain and motion deficit. (R. at 332.) However, Plaintiff's gait and Rhomberg appeared normal. (R. at 332.)

During Plaintiff's March 4, 2008 physical therapy session, Plaintiff demonstrated improved pelvic mobility and strength in her right lower back, but Plaintiff continued to complain of pain. (R. at 397.) However, she estimated that her pain reached a three on a one-to-ten scale. (R. at 397.) Plaintiff underwent a discharge assessment at the conclusion of her March 4, 2008 physical therapy appointment. (R. at 387.) At that time, it was reported that Plaintiff experienced pain on a less than daily basis. (R. at 387.) Plaintiff's aquatic therapy and stretching relieved her pain, but climbing stairs and walking for more than ten minutes increased her pain. (R. at 387.)

Plaintiff continued treatment with Dr. Bower on March 10, 2008, during which Plaintiff indicated that she experienced minimal flare of pain since her initial treatment. (R. at 326.) Plaintiff's gait and Romberg were normal, but she experienced extreme tenderness and swelling in her right hip. (R. at 327.) Dr. Bower ordered Plaintiff to continue therapy. (R. at 328.) On March 28, 2008, Dr. Bower indicated that Plaintiff's pain improved, but she still suffered pain when weight-bearing. (R. at 323, 325.) Plaintiff demonstrated more freedom in her gait. (R. at 325.) During Plaintiff's April 24, 2008 appointment, Plaintiff experienced an extreme flare of pain. (R. at 320.) Dr. Bower ordered a MRI of Plaintiff's right hip. (R. at 322.)

8

On April 29, 2008, Plaintiff's MRI results revealed that Plaintiff had a mild focal subchondral edema on her right side, moderate right hip joint effusion and mild bilateral trochanteric bursitis. (R. at 382-83.) On May 22, 2008, Plaintiff visited David M. Heilbronner, M.D. for a follow-up appointment based upon a referral from Dr. May. (R. at 357) Dr. Heilbronner noted that Plaintiff demonstrated a "fairly significant loss of internal hip rotation," but her external hip rotation remained intact. (R. at 357.) Plaintiff's Trendelnberg test revealed no muscle weakness. (R. at 357.) Dr. Heilbronner opined that Plaintiff could benefit from injections. (R. at 357.)

On December 1, 2008, Plaintiff's physical therapist, Laura Silvey, P.T., completed a physical therapy evaluation and indicated that Plaintiff would not benefit from further physical therapy. (R. at 386.) Ms. Silvey opined that Plaintiff continued to experience limitations and that Plaintiff's aquatic therapy was necessary. (R. at 386.) Plaintiff followed-up with Dr. May on December 9, 2008, and received injections in her back and right hip. (R. at 441.) Dr. May noted that Plaintiff walked with a limp, that Plaintiff's hip did not swing freely and that she demonstrated tenderness. (R. at 441.)

D.     Plaintiff's Testimony

During Plaintiff's December 2, 2008 hearing before the ALJ, Plaintiff indicated that during an average week, she drove her car about seven times. (R. at 24.) She drove to the grocery store three times a week and to church once a week. (R. at 24.) Three days a week she drove to Charlottesville to attend aquatic therapy. (R. at 24.) The drive to Charlottesville took 45 minutes and sometimes required Plaintiff to pull over and lay down in the back seat during the drive due to pain and stiffness. (R. at 44.) Her aquatic therapy lasted an hour. (R. at 35.)

Plaintiff took Tramadol daily and sometimes the medication helped alleviate her pain. (R. at 32.) When on medication, she rated her pain as a five or six on a scale of one-to-ten. (R. at 33.) She previously took codeine, but did not like the side effects. (R. at 33, 38-39.) Plaintiff explained that her doctors did not recommend any operation or treatment that Plaintiff did not try. (R. at 39.) Further, Plaintiff's doctors never ordered any permanent restrictions for Plaintiff. (R. at 39.)

Plaintiff indicated that she could not lift from below the waist, but could lift ten pounds from the waist or above. (R. at 34.) She could stand for a few minutes at a time and could sit five to ten minutes if she shifted in her seat. (R. at 34-35.) However, she sat for about twenty minutes during the hearing. (R. at 43.) Plaintiff could walk the length of a grocery aisle without having to stop and rest, which the ALJ estimated to be roughly 30 feet. (R. at 35.) She used crutches for two weeks after falling and spraining her ankle. (R. at 36.) She had no problems with using her hands and arms. (R. at 36.) Plaintiff had difficulty remembering and concentrating, which Plaintiff indicated that her doctors attributed to stress. (R. at 41.)

Plaintiff experienced difficulty sleeping at night, but she did not nap during the day. (R. at 32, 36.) However, she had to lie down during the day when her back really hurt. (R. at 36.) Plaintiff estimated that she laid down about two or three times each day for about fifteen to twenty minutes at a time. (R. at 37.) Once the pain was so severe, Plaintiff stayed in bed for almost three days. (R. at 43.)

Plaintiff could not take baths, only showers. (R. at 38.) She went grocery shopping, but it took her longer than one trip to store to complete her shopping. (R. at 37.) She could dust her home, but needed her daughter to do the "major cleaning." (R. at 37.) Plaintiff cared for her flowers and someone helped care for Plaintiff's lawn. (R. at 37-38.) Plaintiff went to church on

a weekly basis and occasionally went out to dinner with her daughter. (R. at 38.) She socialized with family and sometimes went out to get sandwiches with a friend. (R. at 38.)

      E.    Function Report

On January 4, 2008, Plaintiff completed a pain questionnaire, indicating that she felt pain in lower back and right buttocks and experienced trauma in her muscles, nerve endings and joints. (R. at 177-78.) She described the pain as aching, stabbing, burning and throbbing in nature. (R. at 177.) Plaintiff noted that the pain occurred all of the time, but nothing caused the pain to be worse. (R. at 177.) The pain stemmed from a fall that she sustained in May 2007. (R. at 177-78.) She explained that the pain moved from her waist down to her right buttocks. (R. at 177.)

Her pain kept Plaintiff from being able to get up by herself and she required someone to help or needed something to pull herself up with. (R. at 178.) She could not get up after long periods of sitting and suffered difficulty walking on her right leg. (R. at 178.) Plaintiff indicated that her right leg was weak, which sometimes caused her to fall. (R. at 178.) She took Tramadol and participated in therapy to relieve her pain. (R. at 178.) Her medication provided no side effects. (R. at 178.)

Plaintiff also completed a Function Report dated January 4, 2008, in which she wrote that she lived alone in a house. (R. at 179.) She spent her day making breakfast, bathing, getting dressed, exercising, going to therapy two to three times each week, making dinner, watching television and going to bed. (R. at 179.) Plaintiff took care of her dog by taking him outside and feeding him. (R. at 180.)

Her condition affected her ability to sleep and typically she woke up every three hours due to the pain, though her medication sometimes helped. (R. at 180.) Plaintiff had no

difficulties dressing, caring for her hair, shaving and feeding herself. (R. at 180.) However, she had difficulty getting out of the bathtub and using the toilet. (R. at 180.) Plaintiff needed no reminders to tend to her personal needs or take her medication. (R. at 181.) She prepared her own meals, typically once a day, but sometimes more. (R. at 181.) She could perform light cleaning and launder her clothing, but needed her daughter to vacuum and perform heavy cleaning for her. (R. at 181.)

Plaintiff went out daily and drove her car every other day. (R. at 182.) She could go out alone and shop in stores for small grocery items and prescriptions. (R. at 182.) Her daughter bought Plaintiff's heavy items. (R. at 182.) Plaintiff regularly went to therapy, the grocery store and the pharmacy. (R. at 183.) However, she sometimes felt that she could not go to these places alone and asked her daughter to help her. (R. at 183.) Plaintiff could pay her bills, count change, handle a savings account and use a check book. (R. at 182.)

Plaintiff listed walking as her hobby, but indicated that she could not walk well since the onset of her condition. (R. at 183.) Through therapy, Plaintiff could walk up to 15 minutes on a treadmill. (R. at 183.) Overall, she could walk no more than 15 minutes before needing to stop and rest by laying down and stretching. (R. at 184.) Plaintiff spent time with others by talking on the phone daily or hosting visitors. (R. at 183.) She experienced no problem with getting along with her family friends and neighbors, but did not take part in social activities due to her pain. (R. at 184.) Her condition affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks and concentrate. (R. at 184.) However, her condition had no effect on her ability to talk, hear, see, remember, understand, follow instructions, use her hands or get along with others. (R. at 184.) Plaintiff sometimes required crutches to help her walk. (R. at 185.)

F.     Non-treating State Agency Physicians' Opinions

On February 28, 2008, state agency physician Syden Hassan, M.D. completed a Physical RFC Assessment. (R. at 311-17.) Dr. Hassan opined that Plaintiff could occasionally lift ten pounds, but could only "lift slightly less than ten pounds on a frequent basis." (R. at 312.) Plaintiff was limited to standing for two hours during an eight-hour workday, but could sit for about six hours during an eight-hour workday. (R. at 312.) She had unlimited ability to push and/or pull, but could never kneel, crouch, crawl or climb ladders, ropes and scaffolds. (R. at 312-13.) Plaintiff could frequently climb ramps and occasionally climb stairs, balance and stoop. (R. at 313.) Dr. Hassan indicated that Plaintiff experienced no manipulative, visual, communicative or environmental limitations. (R. at 313-14.)

On January 15, 2009, the ALJ referred Plaintiff to Christopher Newell, M.D. for a consultative examination. (R. at 442-45.) Upon examination, Dr. Newell diagnosed Plaintiff with lumbar radiculopathy, right radiculitis, right trochanteric bursitis, hypothyroidism and hypertension. (R. at 445.) Dr. Newell opined that Plaintiff could stand and/or walk for about four to six hours and sit for about six hours during an eight-hour workday. (R. at 445.) Plaintiff could lift/carry ten pounds on a frequent basis and twenty pounds occasionally. (R. at 445.) She could not bend, stoop or squat, but she experienced no manipulative, visual or communicative limitations. (R. at 445.)

On April 11, 2011, Dr. Newell answered interrogatories provided by Plaintiff's counsel. (R. at 489-93.) Dr. Newell indicated that Plaintiff could walk or stand for about fifteen or thirty minutes without needing to sit for fifteen minutes. (R. at 491.) Plaintiff could perform clerical work, but would suffer pain in her right leg if required to push or pull for fifty percent of the day. (R. at 491.) She could not bend at the waist or stoop more than occasionally. (R. at 491.)

## II. PROCEDURAL HISTORY

Plaintiff protectively filed for SSI and DIB on October 24, 2007, claiming disability due to lumbar radiculopathy and right trochanteric bursitis with an alleged onset date of May 23, 2007.  (R. at 11, 13, 73.)  The Social Security Administration ("SSA") denied Plaintiff's claims initially and on reconsideration.  (R. at 73.)  On December 2, 2008, accompanied by counsel, Plaintiff testified before an ALJ.  (R. at 73.)  On August 12, 2009, the ALJ denied Plaintiff's application, finding that she was not disabled under the Act.  (R. at 73-80.)

The Appeals Council vacated and remanded the ALJ's decision to hold a supplemental hearing, further evaluate Plaintiff's earnings, consider Plaintiff's past relevant work, obtain testimony from a VE if required and further develop the record if necessary.  (R. at 81-84.) Following the remand order by the Appeals Council, the ALJ conducted a supplemental hearing on February 7, 2011, during which Plaintiff testified.  (R. at 56-67.)  On September 14, 2011, the ALJ denied Plaintiff's application for the second time.  (R. at 7-17.)  The Appeals Council subsequently denied Plaintiff's request for review on March 12, 2013, rendering the ALJ's decision the final decision of the Commissioner.  (R. at 1-5.)

### III.    QUESTIONS PRESENTED

1.  Did the ALJ err in determining that Plaintiff could perform her past relevant work?

2.  Does substantial evidence support the ALJ's assessment of Plaintiff's credibility?

### IV.    STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the record and whether the proper legal standards were applied in evaluating the evidence.  *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (citing *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th

14

Cir. 2005)).  Substantial evidence is more than a scintilla, less than a preponderance, and is the kind of relevant evidence a reasonable mind could accept as adequate to support a conclusion. *Id.*; *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citing *Richardson v. Perales*, 402 U.S. 309, 401 (1971)).

To determine whether substantial evidence exists, the Court is required to examine the record as a whole, but it may not "'undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ].'" *Hancock*, 667 F.3d at 472 (citation and internal quotation marks omitted); *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig*, 76 F.3d at 589).  In considering the decision of the Commissioner based on the record as a whole, the Court must "'take into account whatever in the record fairly detracts from its weight.'" *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)).  The Commissioner's findings as to any fact — if the findings are supported by substantial evidence — are conclusive and must be affirmed regardless of whether the reviewing court disagrees with such findings. *Hancock*, 667 F.3d at 472 (citation omitted).  If the ALJ's determination is not supported by substantial evidence on the record or if the ALJ has made an error of law, the Court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a claimant's work and medical history is required to determine if a claimant is eligible for benefits.  20 C.F.R. §§ 416.920, 404.1520; *Mastro*, 270 F.3d at 177. The analysis is conducted for the Commissioner by the ALJ, and it is that process that a court must examine on appeal to determine whether the correct legal standards were applied, and whether the resulting decision of the Commissioner is supported by substantial evidence on the record. *See Mastro*, 270 F.3d at 176-77.

The first step in the sequence is to determine whether the claimant was working at the time of the application and, if so, whether the work constituted "substantial gainful activity" ("SGA").[2] 20 C.F.R. §§ 416.920(b), 404.1520(b). If a claimant's work constitutes SGA, the analysis ends and the claimant must be found "not disabled," regardless of any medical condition. *Id.* If the claimant establishes that she did not engage in SGA, the second step of the analysis requires her to prove that she has "a severe impairment . . . or combination of impairments which significantly limit[s] [her] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c); *see also* 20 C.F.R. § 404.1520(c). To qualify as a severe impairment that entitles one to benefits under the Act, it must cause more than a minimal effect on one's ability to function. 20 C.F.R. § 404.1520(c).

At the third step, if the claimant has an impairment that meets or equals an impairment listed in 20 C.F.R. pt. 404, subpt. P, app. 1 (listing of impairments) and lasts, or is expected to last, for twelve months or result in death, it constitutes a qualifying impairment and the analysis ends. 20 C.F.R. §§ 416.920(d), 404.1520(d). If the impairment does not meet or equal a listed impairment, then the evaluation proceeds to the fourth step in which the ALJ is required to determine whether the claimant can return to her past relevant work[3] based on an assessment of

---

[2] SGA is work that is both substantial and gainful as defined by the Agency in the C.F.R. Substantial work activity is "work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. § 404.1572(a). Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b). Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like, are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572(c).

[3] Past relevant work is defined as SGA in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved. 20 C.F.R. §§ 416.965(a), 404.1565(a).

the claimant's residual functional capacity ("RFC")[4] and the "physical and mental demands of work [the claimant] has done in the past." 20 C.F.R. §§ 416.920(e), 404.1520(e).  If such work can be performed, then benefits will not be awarded.  *Id.*  The burden of proof remains with the claimant through step four of the analysis, such that she must prove that her limitations preclude her from past relevant work.  *Bowen v. Yuckert,* 482 U.S. 137, 146 n.5 (1987); *Hancock,* 667 F.3d at 472 (citation omitted).

However, if the claimant cannot perform her past work, the burden then shifts to the Commissioner at the fifth step to show that, considering the claimant's age, education, work experience, and residual functional capacity ("RFC"), the claimant is capable of performing other work that is available in significant numbers in the national economy.  20 C.F.R. §§ 416.920(f), 404.1520(f); *Powers v. Apfel,* 207 F.3d 431, 436 (7th Cir. 2000) (citing *Yuckert,* 482 U.S. at 146, n.5 (1987)).  The Commissioner can carry his burden in the final step with the testimony of a VE.  When a VE is called to testify, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all of the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform.  *Walker v. Bowen,* 889 F.2d 47, 50 (4th Cir. 1989).  Only when the hypothetical posed represents *all* of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful."  *Id.*  If the ALJ

---

[4] RFC is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis.  A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."  SSR 96-8p.  When assessing the RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.,* 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record.  *Id.* (footnote omitted.)

finds that the claimant is not capable of SGA, then the claimant is found to be disabled and is accordingly entitled to benefits. 20 C.F.R. §§ 416.920(f)(1), 404.1520(f)(1).

## V.    ANALYSIS

### A. The ALJ's Opinion

The ALJ found at step one that Plaintiff had not engaged in SGA since the alleged onset of her disability. (R. at 13.) At step two, the ALJ found that Plaintiff had the severe impairments of lumbar radiculopathy and right trochanteric bursitis. (R. at 13.) However, at step three, the ALJ determined that that these impairments did not meet or equal any listing in 20 C.F.R. pt. 404, subpt. P, app. 1. (R. at 14.)

The ALJ next determined that Plaintiff maintained the RFC to perform a full range of sedentary work. (R. at 14.) In making this determination, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that Plaintiff's statements concerning the intensity, persistence and limiting effects of her condition were not fully credible. (R. at 15.) At step four, the ALJ determined that Plaintiff could perform her past relevant work as a "Supervisor, Lending Activities" as generally and actually performed, because the work is not precluded by Plaintiff's RFC. (R. at 16-17.) Accordingly, the ALJ concluded that Plaintiff was not disabled under the Act. (R. at 27.)

Plaintiff moves for a finding that she is entitled to benefits as a matter of law, or in the alternative, she seeks reversal and remand for additional administrative proceedings. (Pl.'s Mem. at 30.) Specifically, Plaintiff argues that the ALJ erred in finding that Plaintiff maintained the ability to perform her past relevant work as a "Supervisor, Lending Activities" on the basis that she cannot perform the work as actually performed by Plaintiff or generally performed pursuant to the job description. (Pl.'s Mem. at 16-22.) Plaintiff further contends that the ALJ's

assessment of Plaintiff's credibility lacks the support of substantial evidence. (Pl.'s Mem. at 22-29.) Defendant contends that substantial evidence in the record supports the ALJ's determinations. (Def.'s Mot. for Summ. J. and Br. in Supp. Thereof ("Def.'s Mem.") at 15-25.)

> B. The ALJ did not err in determining that Plaintiff could perform her past relevant work.

Plaintiff argues that the ALJ erred in determining that Plaintiff could perform her past relevant work as a "Supervisor in Lending Activities," both generally and as actually performed. (Pl.'s Mem. at 16-17.) Specifically, Plaintiff argues that no evidence exists to demonstrate that the position, as actually performed by Plaintiff, was sedentary in nature. (Def.'s Mem. at 18.) Further, Plaintiff maintains that Plaintiff's position was not sedentary in nature generally, because the VE lacked a description of Plaintiff's job. (Def.'s Mem. at 18-20.) Defendant responds that substantial evidence supports the ALJ's determination. (Def.'s Mem. at 15-20.)

At step four of the sequential analysis, the ALJ must assess the claimant's RFC and past relevant work to determine if the claimant is able to perform the tasks of her previous employment. 20 C.F.R. § 404.1520(a)(4)(iv). In assessing Plaintiff's ability to perform her past relevant work, the Commissioner may rely on the general job categories of the DOT as presumptively descriptive of a claimant's prior work. *See* SSR 82-61 ("The Dictionary of Occupational Titles (DOT) descriptions can be relied upon – for jobs that are listed in the DOT – to define the job as it is usually performed in the national economy.") Moreover, agency rulings specifically contemplate "that some individual jobs may require somewhat more or less exertion than the DOT description." *Id.*

Further, 20 C.F.R. § 416.960(b)(2) provides that the ALJ may use the services of a Vocational Expert ("VE") or look to the DOT when determining the demands of Plaintiff's past relevant work and whether her RFC allows her to perform such work. 20 C.F.R. § 416.960(b)(2)

("We may use the services of vocational experts or vocational specialists, or other resources, such as the 'Dictionary of Occupational Titles' . . . to obtain evidence we need to help us determine whether you can do your past relevant work, given your residual functional capacity."). Moreover, the test for evaluating a Plaintiff's past relevant work experience is not whether she may perform the heightened demands of her actual position, but the demands as generally required by employers throughout the economy. SSR 82-61. "[I]f the claimant cannot perform the excessive functional demands and/or job duties actually required in the former job but can perform the functional demands and job duties as generally required by employers throughout the economy, the claimant should be found to be 'not disabled.'" SSR 82-61.

Plaintiff argues that the ALJ erred in finding that Plaintiff could perform her past relevant work as actually performed and as generally performed. (Pl.'s Mem. at 16-22.) Here, the VE classified Plaintiff's past relevant work as a "Supervisor, Lending Activities." (R. at 245.) Indeed, the VE obtained information regarding Plaintiff's past relevant work from Plaintiff's employer's position descriptions. (R. at 16.) In reaching his decision, the ALJ relied upon both the VE interrogatories and the DOT description of a "Supervisor, Lending Activities" to determine whether Plaintiff's RFC allowed her to perform her past relevant work. (R. at 16.) The VE specifically indicated that this prior job was defined in the DOT at 249-137-034. (R. at 16.) The DOT classifies the job of "Supervisor, Lending Activities" as skilled, sedentary work. (R. at 16.) Therefore, the ALJ did not err in determining Plaintiff's past relevant work as a "Supervisor, Lending Activities" as generally performed as being sedentary in nature. Because the ALJ determined that Plaintiff maintained the RFC to perform sedentary work and the position of "Supervisor, Lending Activities" as generally performed as being sedentary in nature,

substantial evidence supports the ALJ's determination that Plaintiff could perform her past relevant work as generally performed.

Plaintiff's argument that the ALJ failed to properly evaluate the job as actually performed by Plaintiff because Plaintiff's actual job was not sedentary by nature fails, because the ALJ determined that Plaintiff could perform her past relevant work as a "Supervisor, Lending Activities" as generally described throughout the economy and as described above, substantial evidence supports the determination. (R. at 16.) The fact that, in her specific job, Plaintiff may have performed duties in excess of her duties as a "Supervisor, Lending Activities" does not alter the ALJ's analysis. SSR 82-61. Therefore, the ALJ properly followed SSA regulations and rulings in reaching his ultimate determination, and substantial evidence supports the ALJ's conclusion that Plaintiff's RFC allowed her to perform her past relevant work as a "Supervisor, Lending Activities."

C. The ALJ did not err is assessing Plaintiff's credibility.

Plaintiff argues that the ALJ erred in assessing Plaintiff's credibility, because the ALJ's reasons for discounting Plaintiff's complaints lack the support of substantial evidence. (Pl.'s Mem. at 22.) Specifically, Plaintiff contends that the record does not support the ALJ's reasoning that Plaintiff's treatment was "conservative," that Plaintiff's activities of daily living are inconsistent with Plaintiff's alleged limitations because Plaintiff demonstrated ample capacity to function, and that Plaintiff's complaints were inconsistent with the medical record and not supported by substantial evidence. (Pl.'s Mem. at 22-29.) Defendant maintains that substantial evidence supports the ALJ's assessment of Plaintiff's credibility. (Def.'s Mem. at 21-25.)

After step three of the ALJ's sequential analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC. 20 C.F.R. §§ 416.920(e)-(f), 416.945(a)(1). The RFC must incorporate impairments supported by the objective medical evidence in the record and those impairments that are based on the claimant's credible complaints. In evaluating a claimant's subjective symptoms, the ALJ must follow a two-step analysis. *Craig,* 76 F.3d 585, 594 (4th Cir. 1996); *see also* SSR 96-7p; 20 C.F.R. §§ 404.1529(a) and 416.929(a). The first step is to determine whether there is an underlying medically determinable physical or mental impairment or impairments that reasonably could produce the individual's pain or other related symptoms. *Id.*; SSR 96-7p, at 1-3. The ALJ must consider all the medical evidence in the record. *Craig,* 76 F.3d at 594-95; SSR 96-7p, at 5, n.3; *see also* SSR 96-8p, at 13 (specifically stating that the "RFC assessment must be based on all of the relevant evidence in the case record"). If the underlying impairment reasonably could be expected to produce the individual's pain, then the second part of the analysis requires the ALJ to evaluate a claimant's statements about the intensity and persistence of the pain and the extent to which it affects the individual's ability to work. *Craig,* 76 F.3d at 595. The ALJ's evaluation must take into account "all the available evidence," including a credibility finding of the claimant's statements regarding the extent of the symptoms and the ALJ must provide specific reasons for the weight given to the individual's statements. *Craig,* 76 F.3d 595-96; SSR 96-7p, at 5-6, 11.

This Court must give great deference to the ALJ's credibility determinations. *See Eldeco, Inc. v. NLRB,* 132 F.3d 1007, 1011 (4th Cir. 1997). The Fourth Circuit has determined that "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.'" *Id.* (quoting *NLRB v. Air Prods. &*

22

*Chems., Inc.,* 717 F.2d 141, 145 (4th Cir. 1983)). Therefore, this Court must accept the ALJ's

factual findings and credibility determinations unless "'a credibility determination is

unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason

at all.'" *Id.* (quoting *NLRB v. McCullough Envtl. Servs., Inc.,* 5 F.3d 923, 928 (5th Cir. 1993)).

Here, the ALJ found that Plaintiff's medically determinable impairments could

reasonably be expected to cause the alleged symptoms, but that Plaintiff's statements concerning

the intensity, persistence and limiting effects of her condition were not fully credible. (R. at 15.)

In support of his determination, the ALJ noted that Plaintiff's treatment was routine, that

Plaintiff's activities of daily living are inconsistent with Plaintiff's alleged limitations, that

Plaintiff had ample capacity to function and that Plaintiff's complaints were inconsistent with the

medical record, because Plaintiff's condition improved. Substantial evidence supports the ALJ's

assessment.

First, substantial evidence in the record supports the ALJ's determination that Plaintiff

underwent conservative treatment for her condition. Indeed, Plaintiff underwent treatment with

injections, medication and physical therapy, all without the need for surgical intervention. On

May 21, 2007, Dr. May administered an injection to relieve any pain and recommended that

Plaintiff keep her body straight, use ice, stretch and avoid twisting. (R. at 341.) On May 29,

2007, Dr. May recommended that Plaintiff treat her pain with heat and ice and remain passive,

but suggested that Plaintiff should not "lay down and do nothing." (R. at 341.) On October 3,

2007, Dr. May prescribed Plaintiff pain medication and recommended that Plaintiff use a passive

exercise program. (R. at 338.) On October 23, 2007, Dr. Adams opined that pain medications

would be Plaintiff's best treatment option, because structural neurology treatment would not

help. (R. at 305.) On November 6, 2007, Dr. May recommended that Plaintiff continue to take

Ultram and Mobic and undergo physical therapy. (R. at 338.) Dr. Bower noted that no surgical options existed. (R. at 331.) On May 22, 2008, Dr. Heilbronner opined that Plaintiff could benefit from injections. (R. at 357.) Therefore, substantial evidence supports the ALJ's determination that Plaintiff underwent conservative treatment.

Substantial evidence also supports the ALJ's finding that Plaintiff's medical records demonstrated improvement in Plaintiff's condition. On July 2, 2007, Plaintiff rated her pain at a five on a scale of one-to-ten. (R. at 286.) On July 10, 2007, Plaintiff exhibited "some return of function." (R. at 339.) On July 26, 2007, Dr. Lander noted that Plaintiff had a positive response to the injections, had a "mild recurrence of pain" and that the injections reduced the severity of Plaintiff's pain. (R. at 280.) Notes from Plaintiff's November 21, 2007 physical therapy session indicated that Plaintiff's mobility improved and that she had very slight restrictions. (R. at 425.) Also, Plaintiff reported no pain during her November 27, 2007 physical therapy appointment. (R. at 424.) Her pain decreased from a nine to a five on a one to ten scale and to a three during Plaintiff's December 7, 2007, and December 11, 2007 physical therapy sessions, respectively. (R. at 420-21.) During Plaintiff's physical therapy appointment on February 4, 2008, Plaintiff's pain level decreased from a four to a three on a scale of one-to-ten. (R. at 404.) Plaintiff rated her pain as a two on a scale of one-to-ten after her February 20, 2008 treatment. (R. at 401.) Dr. Bower noted that physical therapy helped to a "fair degree." (R. at 331.) On March 4, 2008, Plaintiff demonstrated improved pelvic mobility and strength in her right lower back during her physical therapy session. (R. at 397.) During Plaintiff's physical therapy discharge assessment, it was reported that Plaintiff experienced pain on a less than daily basis, whereas before therapy she complained of continuous pain. (R. at 286, 387.) Accordingly, substantial evidence supports

24

the ALJ's reasoning for discounting Plaintiff's credibility on the basis that her condition improved throughout the course of her treatment.

Further, substantial evidence supports the ALJ's finding that Plaintiff's admitted activities of daily living were inconsistent with her alleged limitations and that Plaintiff demonstrated ample ability to function. Plaintiff herself testified that, during an average week, she drove her car about seven times. (R. at 24.) She drove to the grocery store three times a week and to church once a week. (R. at 24.) Plaintiff cared for her flowers, socialized with family and sometimes went out to get sandwiches or out to dinner with her daughter. (R. at 37-38.) Plaintiff cared for her dog and had no difficulties dressing, caring for her hair, shaving and feeding herself. (R. at 180.) She prepared her own meals, performed light cleaning and laundered her clothing. (R. at 181.) Plaintiff went out daily and drove her car every other day. (R. at 182.) Therefore, substantial evidence supports the ALJ's determination.

Finally, substantial evidence supports the ALJ's credibility assessment on the basis that Plaintiff's medical records are inconsistent with Plaintiff's RFC. Dr. Lander administered steroid injections and Plaintiff maintained full motor and sensory function following the procedure. (R. at 284.) Plaintiff exhibited "some return of function" following the injections. (R. at 339.) Plaintiff received additional injections, which Plaintiff tolerated well and Dr. Lander noted that the procedure provided complete pain relief. (R. at 280.) On August 21, 2007, Plaintiff returned to Dr. Lander for a steroid injection, which Plaintiff tolerated well. (R. at 278.) Dr. Adams noted that Plaintiff's EMG failed to demonstrate anything relating to Plaintiff's pain. (R. at 305.) Accordingly, Plaintiff's medical records support the ALJ's assessment of Plaintiff's credibility.

25

## VI.    CONCLUSION

For the reasons discussed herein, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 9) be DENIED; that Defendant's Motion for Summary Judgment (ECF No. 11) be GRANTED; and that the final decision of the Commissioner be AFFIRMED.

Let the Clerk forward a copy of this Report and recommendation to the Honorable John A. Gibney and to all counsel of record.

### NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a *de novo* review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

/s/

David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date:  January 30, 2013